# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00416-COA

**KATHERINE BROWN**                                                                  **APPELLANT**

**v.**

**JIM BROWN**                                                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/25/2020 |
| TRIAL JUDGE: | HON. PAULA DRUNGOLE-ELLIS |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | RICHARD SHANE McLAUGHLIN JAK McGEE SMITH |
| ATTORNEY FOR APPELLEE: | J. DOUGLAS FORD |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 10/05/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE WILSON, P.J., McDONALD AND EMFINGER, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     Katherine Brown appeals the Oktibbeha County Chancery Court's decisions on her two motions for contempt, for enforcement of a divorce judgment and property settlement agreement, and for attorney's fees. Katherine contends that the chancery court erred by declining to address the distribution of the parties' personal property, and in finding Katherine as well as her ex-husband, Jim Brown, in contempt. After a review of the record and relevant precedent, we affirm the chancery court's decisions.

### Facts

¶2.     Jim and Katherine were married on July 1, 1995. They had three daughters and a son.[1] At the beginning of the marriage, Katherine worked as a teacher while Jim completed medical school. Thereafter, Katherine became a stay-at-home mom. Along with his medical practice, Jim also created several businesses of substantial value. The parties also had retirement accounts, life insurance policies, and personal property.

*Divorce Proceedings*

¶3.     On December 8, 2014, Katherine filed for divorce, alleging as grounds constructive desertion, habitual cruel and inhuman treatment, and irreconcilable differences. Jim answered the complaint, on April 30, 2015, and later, he counterclaimed for custody of the children. There ensued a highly litigious two-and-a-half years of extensive discovery, several motions hearings and temporary orders, and an unsuccessful court-ordered mediation.

¶4.     Ultimately, on October 5, 2017, the parties filed a joint motion to dismiss the fault-based grounds of their pleadings and consented to the entry of a judgment of divorce due to their irreconcilable differences. That same day, the chancery court entered an agreed order dismissing the fault grounds and granting a final judgment of divorce. The divorce judgment stated that the parties had, by written agreement, adequately and sufficiently provided for the custody and maintenance of the minor children and the settlement of the parties' property rights.

¶5.     Incorporated into the final judgment was the parties' detailed, thirteen-page, single-

---

[1] To protect their privacy, the children are referred to by their initials. At the time of the divorce in October 2017, daughter ERB was 17, son JBB was 15, daughter MMB was 12, and daughter KGB was 11.

spaced "Property Settlement, Child Custody and Support Agreement" (PSCCSA). By its terms, the parties shared joint legal and physical custody of the minor children, with Katherine receiving physical custody during the first half of the month, and Jim during the second. The agreement contained numerous provisions concerning interactions of the parties with the children, child support, and division of the parties' assets, largely with lump-sum payments being made by Jim to Katherine and with the exchange of deeds to real property. Specific items of personal property were named and divided in the agreement (jewelry, a bass boat, guns, and dogs). Remaining items were covered in Section 3.5(f) of the agreement, "other personalty," which read as follows:

> Within thirty (30) days of entry of the Final Judgment, the parties shall create a global list of all tangible items of marital personalty. The parties then shall divide so much of the items as they can agree upon. Once the items are divided, the parties shall then make a good faith effort to divide the remaining disputed items. If the parties cannot resolve the disputed items within sixty (60) days of entry of the Final Judgment, either party may seek assistance from the Oktibbeha County Chancery Court. Until all tangible items of marital personalty are divided by agreement or otherwise resolved, neither party shall move, transfer, destroy, damage, conceal, sell, assign or change any such item.

Thus, according to the agreement, the parties had sixty days to amicably divide the remaining items of personal property. If they could not, then either party could seek the court's assistance. Until the final division was made, all disputed items would remain in the family home, of which Jim was given possession per the agreement.

¶6. Thereafter, counsel for the parties exchanged lists of the items the parties claimed as heirlooms or gifts, and lists of the remaining disputed marital personal property. Some headway was made with both Katherine and Jim conceding on a number of items. However,

3

negotiations stalled and by an email on October 12, 2017, Katherine's counsel said, "We are through with the back and forth lists. We need to get a hearing date to address the personalty." But Katherine did not seek the court's assistance until seven months later. During that time, the record reflects that the parties were able to divide a number of items that were delivered to Katherine.

*First Contempt Action*

¶7.  On May 9, 2018, Katherine filed a verified petition for contempt against Jim. She alleged that Jim had violated the final judgment in numerous ways with respect to the children that interfered with her relationship with them and deliberately deprived her of her scheduled custodial times. For example, she claimed that she had not had custody of her eldest daughter from November 2017 through May 2018, except for one hour at Christmas. She also alleged that Jim had refused to divide 169 items of marital personal property or transfer an additional 97 items that Katherine claimed as gifts and heirlooms. She sought, among other things, modification of the custody arrangement, an order limiting Jim's communication with the children while they are in her custody, the court's instructions that Jim transfer her personal property, and reimbursement of her attorney's fees.

¶8.  Jim responded that Katherine's contempt action was barred by the doctrine of unclean hands in that Katherine, herself, had violated the divorce judgment. He further said that the two older children, ERB and JBB, had chosen to live with him. Despite this, Jim said he continued to pay Katherine the full amount of child support ordered. According to Jim, the best interests of all the children would be served if he were given full physical custody. Jim

4

claimed that Katherine had refused to cooperate in the allocation of the marital personal property and that the list of items she attached to her motion was incorrect. Jim counterclaimed for contempt against Katherine and for modification of the custody and child-support orders.

*Hearing on First Motion for Contempt*

¶9.    The chancery court heard Katherine's motion and Jim's counterclaim on August 20, 2018 and November 8, 2018.

A.    August 20, 2008 Proceedings.

1.    *Marital Personal Property Division*

¶10.    Prior to presenting any testimony, Katherine's attorney told the court that the parties had agreed on the issue of the division of the marital property. Katherine's attorney informed the court as follows:

MR. SMITH:    Well, we have agreed also, Judge, as to the items of marital property, and we have a very detailed list -- I have got one right here -- of all of the marital property that everyone concedes is marital property. What we have agreed to do is, Dr. Brown and my client are going to add anything to this list that they know of that is marital property at my client's house or Dr. Brown's that's not on the list. Dr. Brown and my client are going to go through this list; and if anything is missing off of this list, that is, it's on the list but it's not in the homes, it's missing, AWOL, whatever you want to call it, Dr. Brown and his attorney are going to mark on here what is missing. And we'll do the same. If we know something is missing, we'll put it on here. And my client will put all of the property that's at her house -- if it's not on this list already, she will put it and add it to this list.

And then at an appropriate date that we'll select, Mr.

5

Ford and I will get together with the clients, flip a coin, whoever wins the toss gets the first pick of the marital property, and it will -- we'll have some different colored highlighters, and we can just mark it as they pick it until it's all gone. And then we can come back to the Court -- if there's any problem of things missing of any substance, we'll come back to the Court and try to get those few items resolved.

And then we're going to put on proof today about the gifts and inheritances. And whatever the Court says is a gift or inheritance, it will be a gift or inheritance. We can arrange a time to exchange that, and then –

THE COURT: If I make a decision, I will give you the time and place that that's going to be done.

MR. SMITH: Thank you. I appreciate it.

THE COURT: You're giving it to me. You're giving it to me to decide.

MR. SMITH: Yes, ma'am.

THE COURT: I will decide everything about it.

MR. SMITH: Great.

THE COURT: Okay. If we get through today, it might be today.

MR. SMITH: Yes, ma'am. Okay. Then if it's not a gift or inheritance, that will then fall onto the list of marital property if it's not already on there --

THE COURT: All right.

MR. SMITH: -- and we can go from there.

Although Katherine had attached lists of property to her contempt petition, no lists of either the agreed-upon marital property or the disputed inherited/gifted property were entered into

6

the record or submitted to the court.

### 2. *Testimony Relating to Issues with the Children*

¶11. Testimony from Katherine, Jim, and three of the children ensued on the other issues raised by the parties in the motion for contempt and response on issues relating to the children. It was established that ERB and JBB had been living exclusively with Jim. JBB testified to trust issues he had with Katherine. Katherine presented her version of various incidents concerning the children. A more extensive recitation of the testimony is not necessary to resolve the issues on appeal. The parties did not complete testimony and the hearing was continued to a later date.

### B. November 8, 2018 Proceedings

### 1. *Testimony Relating to Issues with the Children*

¶12. The hearing on Katherine's case-in-chief continued on November 8, 2018, with testimony from the eldest child, Jim, and Katherine. Their testimony concerned the parties' interaction with the children and incidents relating to them. ERB testified about her relationship with Katherine and why she left to stay with Jim.

### 2. *Marital Personal Property Division*

¶13. At the end of the hearing, the chancery court inquired about the division of the property. The attorneys reported that they had two lists, one of the claimed inherited/gifted items which they had whittled down to fifty items, and the other with the rest of the marital property. As they had previously told the court, the attorneys said that the parties were going to flip a coin and alternately choose from the final list of marital property. The chancery

court required the parties to submit, by November 15, 2018, any proof that either party had on the inherited/gifted items, but they were to proceed with the coin toss and division of the agreed-upon marital property immediately.

<em>Post-Hearing Meeting of the Parties</em>

¶14. After the hearing, the parties met at Jim's attorney's office on November 15, 2018, to choose among the agreed-upon items of personal marital property with the party winning the coin toss being the first to choose. According to Jim's attorney, before the coin toss, Katherine declared that she wanted the "blue dishes." When she was told that the parties needed to flip the coin first, Katherine refused and left the office with no resolution of the personal property being accomplished. Additionally, the record does not reflect that either party submitted any information to the chancery court on the disputed inherited/gifted items by the November 15th deadline that the court set.

<em>Chancery Court Orders</em>

¶15. On November 30, 2018, the chancery court entered an order stating that after hearing testimony for two days that concentrated on issues regarding the children, the court had learned that the parties had not divided the personal marital property as previously ordered. The court held in abeyance any ruling on the contempt motion and said it would set aside the divorce judgment if the parties did not resolve the personal-property issues by December 10, 2018.

<em>Jim's December 7, 2018 Motion for Reconsideration</em>

¶16. As set forth in the property settlement agreement, the deadline for the parties to seek

the court's assistance about the division of the marital property expired on December 5, 2017 (sixty days from the October 5, 2017 divorce decree). On December 7, 2018, Jim filed a motion for reconsideration of the court's November 30, 2018 order, asking the court to rule that Katherine had waived her right to any of the personal marital property by her refusal to abide by the parties' agreement for dividing the property. Jim recounted the parties' meeting on November 15, and how Katherine refused to flip the coin and left. On December 10, 2018, Katherine filed her own motion in response to the November 30, 2018 order, asking the Court to extend the time for dividing the personal property to December 17, 2018.[2]

¶17.    Katherine did not file a response to Jim's motion for reconsideration. But during a later oral argument, Katherine's counsel represented to the court that when they went to divide the property, Jim and his counsel were willing to give Katherine some gifts from her mother and grandmother. However, they refused to talk about other gifts and inheritances. Katherine's counsel admitted that Katherine became angry and left the meeting.

*Chancery Court's December 21, 2018 Order*

¶18.    On December 21, 2018, the chancery court withdrew its November 30, 2018 order and entered an opinion and final judgment. In footnote one of its opinion, the chancery court said that it would not address any issues regarding personal property because "if it had been informed that there were outstanding personal property issues, the [c]ourt would not have signed the Final Judgment of Divorce."

---

[2] According to the docket, Katherine never pursued this motion. Moreover, Jim responded to the motion, alleging untimeliness under Mississippi Rule of Civil Procedure 59(e).

9

¶19. Moving on to deal with the issues of custody and child support, the chancery court found that there was no credible evidence that Katherine had done anything that was not in the best interest of the children. Nor was there any credible evidence of any erratic behavior on Katherine's part. On Jim's part, the chancery court found it astonishing that after an argument with her mother, Jim allowed the oldest daughter to leave Katherine's home and permanently reside with him, depriving Katherine of her court-ordered periods of custody with the daughter. The chancery court was also concerned about Jim's telling JBB that he did not have to visit with Katherine if JBB did not want to. This son also had been living permanently with Jim in violation of the divorce decree. After observing JBB's behavior, the court also encouraged the parties to seek counseling for him. Applying the legal standards for modifying a divorce judgment to change custody of children, the chancery court found that neither of the parties had met their burden to prove a material change in circumstances that adversely affected the children that would compel the court to take the "jolting, traumatic" action of changing custody. The chancery court further found that both parties were in contempt of the divorce judgment, and denied attorney's fees.

*Katherine's Post-Hearing Filings*

¶20. On January 2, 2019, Katherine filed a motion to alter or amend the December 21, 2018 judgment. She contended that the chancery court specifically found that Jim had violated numerous provisions of the divorce judgment and found that there was no proof that Katherine had done anything not in the best interest of the children, nor had Katherine acted erratically. Katherine argued that the chancery court made no finding to support its

10

conclusion that "both parties" were in contempt. Accordingly, Katherine argued that she was entitled to payment of her attorney's fees. Katherine requested that she be given custody of the three younger children, or at least that the court should enforce the judgment that gives her custody of all the children for half of each month. Katherine also sought a court order, and not just a recommendation, that JBB undergo counseling, and that Katherine be allowed to choose the counselor. Jim opposed Katherine's motion, raising its timeliness and challenging its grounds under Mississippi Rule of Civil Procedure 59(e). He also denied the allegations contained therein.

¶21. In her motion, Katherine did not raise the issue of the chancery court's refusal to distribute the parties' personal property. But her attorney attempted to restart discussions on the matter in correspondence with Jim's attorney. Jim's attorney responded that he was not authorized to deal any further on the matter of the property division and to contact Jim directly.

*Second Motion for Contempt*

¶22. On February 13, 2019, Katherine filed a second motion for contempt and to enforce the divorce judgment. In it, she said that the parties had tried to reach an agreement on the division of the personal marital property, but they were unsuccessful. Katherine also raised Jim's interference with the recommended counseling of JBB that the court had ordered.[3] Katherine sought orders concerning both matters, including an order on the inherited/gifted

---

[3] Apparently the parties met with the chancery court on the first day of the term, August 20, 2018, and the court ordered the counseling for the minor child. But there is no transcript from that meeting nor any order from the chancery court in the record reflecting this verbal order.

items, an order compelling Jim to participate in the coin-toss procedure to divide the marital property, and an order finding Jim in contempt and awarding her attorney's fees. In his response to this pleading, Jim argued that Katherine's motion was not timely filed, that she was barred from seeking relief because she had "unclean hands," that the division of the marital property issue was res judicata, and that Katherine was not entitled to any relief. He also filed a motion to dismiss and affirmatively stated the defenses he raised in response to Katherine's motion for contempt. Jim also filed a motion to correct a clerical mistake in the December 2018 order.[4]

*January 30, 2020 Hearing*

¶23. The case was assigned to a new chancellor who heard the outstanding motions on January 30, 2020. Concerning the division of the property, Katherine had argued that all the marital property, except approximately fifteen items that she took when she left, were still at Jim's home. Jim countered that approximately 180 items—two truckloads—were delivered to Katherine and there was not much else to divide; hence the agreement to flip a coin. Jim argued that the parties met, but Katherine began the meeting by insisting that she receive the blue dishes. When they reviewed the process again and the need to first flip a coin, Katherine got up and walked out of the meeting. Jim's attorney told the court that when Judge Dorothy Colom found out about the failed attempt at a coin toss, she said she was not going to deal with the division of marital property any further. Thus, Jim argued that

---

[4] Footnote five of the December 21, 2018 order said that three of the children had expressed a desire to life with their "mother." But this was incorrect because the three had said they wanted to live with the "father."

12

Katherine's motion should be denied because she had unclean hands and that the matter was res judicata. On rebuttal, Katherine's attorney admitted that two truckloads of items were delivered, but he contended that there were still 180 items missing. He also admitted that Katherine had walked out of the coin-toss meeting.

¶24. After argument the chancellor found that Katherine's motion to alter and amend was timely filed. Next, the chancellor said that her predecessor had taken forty-four pages of notes and heard the case over two days. If there were no basis for the finding that Katherine was also in contempt, then Katherine would have attached the transcript or shown in the transcript where she herself had not violated the orders of the court. But she did not. The chancery court found:

> So by [Katherine] not attaching a copy of the transcript for the [c]ourt to review and outlining or making reference to any provisions or showing there were no provisions that show that she had committed contempt, the [c]ourt will have to stand by what Judge Colom had indicated in her opinion of final judgment that was rendered and entered in December 21, 2018. So in reference to that particular request, the [c]ourt is going to deny that.

Concerning the issue of counseling for the minor child, the chancery court exercised its discretion to order that it be undertaken and that the father "stay out of it."

¶25. Concerning the issue of the division of the marital property, the chancery court said:

> Well, let me state this. The parties got divorced October 5, 2017. And I'm sure that, as the opinion stated, it was contentious divorce. I don't doubt that. But they did an ID divorce, what we call irreconcilable differences. So when you do that, you put in certain language that you have done everything-- that you have divided whatever and that then if there is something that you need the [c]ourt to decide upon, whether it is custody or for division or make an equitable distribution or division of personal property, you ask the [c]ourt to do that. Of course, your divorce is never final until the [c]ourt has ruled, has a hearing on that particular part that you asked for.

13

Now, I do understand when that was filed, it stated that the parties were going to divide things. But there was a paragraph in there. And based on what I have read, that stated if the parties couldn't agree, that the judge would decide it. Well, the judge didn't see it. And she specifically stated that[] [i]f she had known that the parties had not divided this property, she wouldn't have granted them a divorce. She would not have signed the final judgment of divorce. And I believe that to be true.

Therefore, my position is this is a matter that should have been decided, that it is over. It is done with. And I'm not going to revisit it, either. There is no reason -- and I understand what you have done in the First Judicial District. This is the 14th Judicial District. Maybe we do things differently here. I understand what you think. But this is over. It is done with. And I had -- you know, we consulted, and we have talked in chambers. Now, Judge Colom, just for the record, in an order of November 30, 2018, she indicated that this was to be resolved and, if it hadn't been resolved by December 10, 2018, she was going to set aside your divorce. Now, I'll say it again and I'll say it on the record. If it is something you want resolved and you have a right to file a motion for me to set aside this divorce and they can be married again, I mean, if that's what you want me to do. But otherwise, at this point, everything is final. That property issue is final, as far as I'm concerned, and I'm not going to revisit it. Judge Colom ruled basically the same thing. She would not even address the issue. So that's the ruling of this [c]ourt, that it is resolved, decided. I'm not going back on in reference to personal property. It's unfortunate you couldn't work together, couldn't figure out things. Too bad. But all of that should have been taken care of before you presented your ID divorce to the judge. And then you should have asked the judge at that time to resolve that, knowing that you couldn't get along. And you should have asked the judge at that time to determine who gets what, knowing that you weren't going to be able to do it, get along. So when you failed to do that and bring it to that judge's attention whereby she could have said, you get A, you get B, you get C, and divide that property, then you lost. That was out of the window. She signed that divorce believing that all the property and the agreement had been made. Final. Final decision. I will not revisit it.

*March 25, 2020 Order*

¶26.    On March 25, 2020, the chancery court entered its order on the outstanding motions. It granted Katherine the relief she requested concerning counseling with the minor child, corrected the clerical error in the December 2018 order, but denied all other relief.

14

¶27. On April 24, 2020, Katherine filed her notice of appeal, challenging the November 30, 2018 order, the December 21, 2018 judgment, and the March 25, 2020 order.[5] On appeal, Katherine contends: (1) that the chancery court erred by declining to address the distribution of personal property; and (2) that because the chancery court made no factual finding of contempt against Katherine, it erroneously deprived her of an award of attorney's fees.

**Standard of Review**

¶28. Our review of a chancery court's ruling in a domestic relations case is limited. "We will not disturb the findings of a chancellor unless manifestly wrong, clearly erroneous, or if the chancellor applied the wrong legal standard." *Allgood v. Allgood*, 62 So. 3d 443, 446 (¶7) (Miss. Ct. App. 2011) (citing *McKnight v. McKnight*, 951 So. 2d 594, 595-96 (¶5) (Miss. Ct. App. 2007). "Legal questions, however, are reviewed de novo." *Wangler v. Wangler*, 294 So. 3d 1138, 1142 (¶15) (Miss. 2020).

**Discussion**

I.    **Whether the chancery court erred by declining to address the distribution of personal property.**

¶29. Katherine argues that the parties' written agreement concerning the children and the division of the property complied with Mississippi Code Annotated section 93-5-2 (Rev. 2013) and the court's refusal to divide the personal property of the parties deprives her of any of the disputed marital property. She further argues that the court's decision created a

---

[5] The chancery court withdrew its November 30, 2018 order which was not final. Therefore, it is not an appealable judgment under Rule 4 of the Mississippi Rules of Appellate Procedure.

15

constructive trust on her behalf. Jim counters that Katherine waived court distribution of the marital property when she presented no evidence on that issue to the court because the parties agreed to the coin-toss settlement. Jim further argues that Katherine was not entitled to any relief due to her "unclean hands" after walking out of the coin-toss meeting.

¶30. Section 93-5-2 provides two ways by which parties may obtain a divorce on the grounds of irreconcilable differences. They may agree to the divorce and sign an agreement that resolves all issues of custody, child support, alimony and property claims (section 93-5-2(2)) or they can agree on the divorce but allow the chancery court to adjudicate the other issues (section 93-5-2(3)).[6] In this case, the Browns' PSCCSA that reserved one area for potential court adjudication meant their divorce proceeded under section 93-5-2(3).

¶31. There have been instances where a party's change of heart concerning a previous agreement to divide property has led to the setting aside of a divorce decree. For example, in *Sanford v. Sanford*, 124 So. 3d 647, 649 (¶6) (Miss. 2013), on the day of trial, the

---

[6] Section 93-5-2(3) read in part:

> If the parties are unable to agree upon adequate and sufficient provisions for the custody and maintenance of any children of that marriage or any property rights between them, they may consent to a divorce on the ground of irreconcilable differences and permit the court to decide the issues upon which they cannot agree. Such consent must be in writing, signed by both parties personally, must state that the parties voluntarily consent to permit the court to decide such issues, which shall be specifically set forth in such consent, and that the parties understand that the decision of the court shall be a binding and lawful judgment. . . . No divorce shall be granted pursuant to this subsection until all matters involving custody and maintenance of any child of that marriage and property rights between the parties raised by the pleadings have been either adjudicated by the court or agreed upon by the parties and found to be adequate and sufficient by the court and included in the judgment of divorce."

16

divorcing parties consented to an irreconcilable differences divorce. Ultimately, they also agreed on property settlement issues, except the division of household goods, which they said may be the one thing for the court to determine. *Id*. at 650 (¶¶9-10). The parties had decided that the wife would make a list of the items she wished to keep, and the husband would review it and list those items he disagreed with. *Id*. at (¶9). A month after the divorce hearing, the wife proceeded to list all the items in the home and claimed the entire contents for herself. *Id*. at (¶10). When the husband disagreed, the wife moved to withdraw her consent to the divorce. *Id.* The husband responded with a motion for contempt and the chancery court found the wife in contempt. *Id*. at (¶11).

¶32.   However, on appeal, we reversed the finding of contempt and the Mississippi Supreme Court agreed. *Id*. at 654 (¶27). It said that at the time of the divorce hearing, the purported settlement that was dictated into the record did not settle all property rights because the division of household goods remained unresolved. *Id.* at 654 (¶26). The supreme court further said that the parties never complied with either section 93-5-2(2) or section 93-5-2(3) at the time the wife withdrew her consent. *Id*. It held that "[b]ecause the requirements of neither Section 93-5-2(2) nor Section 93-5-2(3) were completely met here, we affirm the judgment of the Court of Appeals, reverse the judgment [of contempt], and remand the case for further proceedings consistent with this opinion." *Id*. at (¶28). In essence, the parties were back before the chancery court, undivorced, to begin the process again.

¶33.   The facts of this case differ from those in *Sanford* in that here Katherine never withdrew her consent to the divorce and a judgment of divorce was entered. She argues that

she was merely attempting to enforce the PSCCSA through the filing of two contempt actions. But in her arguments to the courts, she fails to acknowledge three critical facts: namely, that Katherine failed to seek the court's assistance within the sixty-day deadline after the entry of the divorce decree on October 5, 2017 as set out in the PSCCSA;[7] that after filing her initial contempt action, the parties announced a settlement of the property division issue; and that she failed to comply with that settlement agreement. Accordingly, her claim that the chancery court erred in refusing to divide the personal property items fails.[8]

### A. Failure to Comply with Settlement and Court Orders

¶34. Our supreme court has found that a party who fails to take the necessary action to enforce or protect his or her rights under a property settlement agreement must bear the consequences for his or her failure. In the case of *Hanlin v. Hanlin (In re Dissolution of Marriage of Hanlin)*, 164 So. 3d 445 (Miss. 2015), the parties' separation agreement required that the husband maintain military medical insurance on the wife "as allowable by statute." *Id*. at 446 (¶1). Assuming that she had coverage for another year, the wife declined medical insurance at her job. *Id*. at 447 (¶2). The divorce was granted in 2007 and in 2008, the wife underwent medical procedures that the husband's insurance initially paid for, but later denied. *Id*. at (¶3). The wife was sued by the medical providers and incurred bills totaling

---

[7] The deadline expired on December 5, 2018. Only after that, on December 10, 2018, Katherine asked the court to extend the time.

[8] We note that problems with the marital property division in this case arose because the parties did not complete their attempt at the division of the property before the judgment of divorce was presented to the court. The better practice would be that the parties clearly present all issues—agreed upon and disputed—to the court for approval and/or resolution prior to the entry of the judgment of divorce.

$27,305.20. *Id*. In 2012, the husband filed a motion for contempt for the wife's failure to refinance or sell the home and the wife counterclaimed for the husband's insurance failure to maintain insurance. *Id*. at (¶4). The chancery court judge found the husband in contempt and ordered that he pay half of the medical bill. *Id*. at (¶5). On appeal, we affirmed the chancery court's ruling. *Id*. at (¶6). But on petition for writ of certiorari, the Mississippi Supreme Court reversed. *Id*. at 451 (¶23). The supreme court found the language of the parties' property settlement agreement to be clear and unambiguous. *Id*. at 451 (¶21). It further reviewed the federal statute on military insurance coverage and determined that the wife had failed to take the necessary steps to be covered. *Id*. at 450 (¶19). Thus, the supreme court found that the husband had not breached the settlement agreement. *Id.* at 451 (¶22). "[The husband] should not be penalized where the coverage was fully available to [the wife], and she and her attorney merely failed to ascertain and take advantage of the insurance benefits 'allowable by statute to the divorced spouse of a retired military person.'" *Id*. at (¶21). The supreme court reversed the chancery court's finding of contempt and order that required the husband to pay half of the medical bills the wife incurred and rendered judgment in favor of the husband. *Id*. at (¶23). Thus, because of her own actions, the wife was left fully responsible for the $27,305.20 in medical bills.

¶35. Similarly, in this case, Katherine had several opportunities to enforce any rights she had under the PSCCSA or the coin-toss settlement she and Jim reached to resolve the matter. However, because she failed to utilize these opportunities and failed to comply with court orders in the process, it was within the chancellor's discretion to find that she must suffer the

consequences.

¶36.    Katherine's first opportunity was shortly after the divorce.  Under their PSCCSA, the parties were to list the property and attempt to divide it amicably.  The agreement gave the parties sixty days to agree.  The agreement was signed on September 29, 2017, and the judgment of divorce incorporating it was signed on October 5, 2017.  But on October 12, 2017, Katherine said she was through with the lists and said that the chancery court's intervention was needed.  But she took no action to set the matter before the court until months later.

¶37.    Katherine's second opportunity to secure a division of the marital property was to comply with the settlement she reached during her first contempt action.  At the start of the August 20, 2018 hearing on Katherine's first motion for contempt wherein she accused Jim of failing to amicably divide the marital property, Katherine's attorney announced a settlement of the parties on this issue.  The parties had compiled a list of marital property and they agreed they would each alternately choose an item.  They would seek the assistance of the court only for approximately fifty disputed items.  This settlement was again announced to the chancery court at the close of the hearing on November 8, 2018.  The chancery court approved this procedure both times and ordered the parties to proceed with the coin toss immediately and submit information on the disputed inherited/gifted items by November 15, 2018.  But when the parties eventually met, Katherine walked out when Jim would not agree to give her an item before the coin was even tossed.

¶38.    The chancellor gave Katherine a third chance when, after learning of the aborted

20

meeting and that no one had submitted information to the court on the claimed inherited or gifted items, the chancery court ordered the parties to complete the process by December 10, 2018 or have the divorce judgment nullified altogether. Katherine made no further attempt to meet with Jim again at that time, nor did she submit any lists of items in dispute by the deadline. On December 21, 2018, the chancery court then entered its final order on Katherine's first contempt motion. In it, the chancery court declined to deal with the issue of the marital property any further.

¶39. In essence, as did the wife in *Hanlin*, Katherine failed to take advantage of the opportunities she was given to resolve the issue of the division of the marital property. She had settled the issue but then walked out of the coin-toss meeting. Furthermore, she failed to submit any information to the court on any disputed items as ordered. Jim was not in contempt with regards to the division of the property and the chancery court's order of December 21, 2018 was not in error.

### B. Breach of Settlement Agreement

¶40. A settlement reached by parties, announced to the court, and read into the record is binding on the parties. In *Brown v. Thomas*, 757 So. 2d 1091 (Miss. Ct. App. 2000), Brown sued Thomas in chancery court for specific performance on a contract they had whereby Thomas would purchase an apartment building from Brown. *Id*. at 1092 (¶2). On the second day of trial, the parties reached a settlement that was read into the record and included in the order of dismissal entered by the court. *Id.* at 1092, 1093 (¶¶4, 6). In a later action for reconsideration of the order brought by Brown, the chancery court found for Thomas, saying

that the original issues were resolved by the agreement of the parties at trial and ordered that the sale of the property continue. *Id.* at 1093 (¶8). Brown appealed and we affirmed the chancery court's ruling. *Id.* at 1096 (¶5). We said that the parties' settlement reflected the terms of their original contract and had only changed the procedure for making payments. *Id.* at 1094 (¶14). Clearly, *Brown* stands for the proposition that an oral agreement reached during litigation and read into the record of the court in open court is binding on the parties.

¶41. Similarly, in this case Katherine filed a petition to hold Jim in contempt of court for allegedly failing to divide the parties' personal property. At trial, the parties announced a settlement of this claim which did not change the actual terms of the PSCCSA but set forth a specific agreed method for doing so. The parties would toss a coin to determine who would choose first from a list of the marital property and alternately select items thereafter. This was read into the record and became a binding agreement on Katherine. Information on disputed inherited/gifted items would be provided to the court.

¶42. "It is well-established in Mississippi law that a property-settlement agreement is a binding contract between the parties." *Wilson v. Wilson*, 53 So. 3d 865, 869 (¶12) (Miss. Ct. App. 2011). Breach of contract is proven by showing the existence of a valid contract and a failure to perform a substantial part of the contract or one or more of its essential terms or conditions. *Maness v. K & A Enters. of Miss. LLC*, 250 So. 3d 402, 414 (¶43) (Miss. 2018). In this case, Katherine breached this agreement without justification by refusing to participate in the coin toss unless she received certain items beforehand and by walking out of the

meeting thereafter.[9]

¶43.    One in breach of a contract cannot successfully maintain an action to enforce it against the other.  In equity, this principle is known as the "clean hands doctrine."  "In sum, whenever a party seeks to employ the judicial machinery in order to obtain some remedy and that party has violated good faith or some other equitable principle, the doors of the court will be shut against him and the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." *Pruitt v. Payne*, 14 So. 3d 806, 811-12 (¶13) (Miss. Ct. App. 2009).  "[U]nder the clean hands doctrine, anyone that comes before a court of equity must do equity as a condition of recovery." *Dill v. Dill*, 908 So. 2d 198, 202 (¶11) (Miss. Ct. App. 2005) (internal quotation marks omitted).  In this case, Katherine's failure to comply with the settlement reached in her first contempt action barred her from filing a second contempt action under the "clean hands doctrine."

###    C.    Constructive Trust

¶44.    Katherine argues that the chancery court's failure to enforce the PSCCSA and order Jim to participate in the coin toss for the marital property in essence created an equitable constructive trust of those items on her behalf because they remained at Jim's house. However, Katherine did not raise this issue to the chancery court and we have long held that "a question not raised in the trial court will not be considered on appeal." *Adams v. Bd. of Supervisors of Union Cnty.*, 177 Miss. 403, 170 So. 684, 685 (1936)); *accord, e.g.*, *Triplett v. Mayor & Bd. of Aldermen of City of Vicksburg*, 758 So. 2d 399, 401 (¶9) (Miss. 2000)

---

[9] Katherine also failed to submit her proof on the inherited/gifted items to the chancery court as ordered and thus waived her right to that relief as well.

23

("This Court has long held that it will not consider matters raised for the first time on appeal."); *Brown*, 757 So. 2d at 1094 (¶15) (statute of limitations issue that the plaintiff failed to raise at the trial level was waived on appeal). Accordingly, Katherine is barred from arguing this issue on appeal.

¶45. Notwithstanding the procedural bar, we find that Katherine's argument lacks merit. A constructive trust arises when a party wrongfully withholds personal property from another.

> A constructive trust . . . arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Kilpatrick v. White Hall on MS River, LLC*, 207 So. 3d 1241, 1247-48 (¶26) (Miss. 2016). "Clear and convincing proof is necessary to establish a constructive trust." *Pair A Dice Farms, Inc. v. InSouth Bank of Covington*, 118 So. 3d 165, 169 (¶10) (Miss. Ct. App. 2012) (quoting *Wright v. O'Daniel*, 58 So. 3d 694, 699 (¶21) (Miss. Ct. App. 2011)).

¶46. In this case, Katherine has failed to provide any proof that Jim was wrongfully holding any items that were rightfully hers. There had been no division of the property by the parties as agreed and no adjudication by any court of the ownership of items she claimed. Without any proof, and certainly no "clear and convincing proof" that Jim was wrongfully holding these items, no constructive trust was established.

¶47. In summary, the chancery court did not err in its December 21, 2018 order when it declined to divide the parties' personal property because Katherine failed to comply with the

24

settlement and failed to submit any proof to the court of disputed items, be they inherited/gifted items or general marital property items. Katherine never withdrew her consent to the irreconcilable-differences divorce and she herself willfully failed to enforce her right to obtain her personal property in the several opportunities availed to her. Finally, although procedurally barred, Katherine's constructive trust claim fails as well because there was no clear and convincing proof that Jim was wrongfully holding items that belonged to her.

### D. Chancery Court Order on Second Motion for Contempt

¶48. Although she does not distinguish between the chancery court orders, the March 25, 2020 order entered on Katherine's second motion for contempt—in which she sought an order compelling Jim to participate in the coin-toss meeting—was not erroneous either. After the parties had obtained a divorce, Katherine first moved for contempt and raised the issue of the adjudication of the division of the parties' personal property. That issue was settled and resolved as announced to the court by Katherine's own attorney. As noted above, in its December 21, 2018 order, the chancery court correctly determined that the issue was no longer before the court for consideration. Although Katherine filed a motion to amend or alter the December 21, 2018 order pursuant to Rule 59(e),[10] she did not raise an issue regarding the court's ruling on the property division. Accordingly, after the ten days had elapsed, all other issues in the December 21, 2018 order became final. Katherine did not appeal the property division ruling nor did she seek to modify her motion to alter or amend

---

[10] "A motion to alter or amend the judgment shall be filed not later than ten days after entry of the judgment." M.R.C.P. 59(e).

to include that issue. Instead, Katherine attempted to raise it again in a new contempt action. The chancery court correctly denied her attempt to revisit the issue under the doctrine of res judicata.

¶49. "The doctrine of res judicata bars parties from litigating claims within the scope of the judgment in a prior action. This includes claims that were made or should have been made in the prior suit." *Hill v. Carroll Cnty.*, 17 So. 3d 1081, 1084 (¶8) (Miss. 2009) (citation and internal quotation marks omitted). This applies in contempt actions as well. *See Hanlin*, 164 So. 3d at 449 (¶13) (claims for medical expenses that could have been sought in an earlier contempt proceeding are res judicata in subsequent contempt action). In this case, the parties announced a settlement of the issue of the property division at the beginning and at the end of the hearing of Katherine's first contempt action, and the parties had failed to submit anything further to the chancery court on that issue as ordered. Accordingly, the chancery court's December 21, 2018 order resolved the issue which was not preserved nor appealed. Consequently, Katherine was barred from raising anything further about the property division in the second contempt action and the chancery court did not err in not considering it.

> II. **Whether the chancery court erred in finding Katherine in contempt of court and determining that she was not entitled to an award of attorney's fees.**

¶50. Katherine argues that the chancery court made no finding that she willfully and deliberately ignored an order of the court and, therefore, she should not have been held in contempt. We disagree and find that there is substantial evidence in the record to support the

26

chancery court's ruling that both Jim and Katherine were in contempt of the divorce judgment, and therefore, it correctly denied any award of attorney's fees.

¶51. "Contempt matters are committed to the substantial discretion of the trial court which, by institutional circumstances and both temporal and visual proximity, is infinitely more competent to decide the matter than we are." *Mabus v. Mabus*, 910 So. 2d 486, 491 (¶20) (Miss. 2005) (citing *Cumberland v. Cumberland*, 564 So. 2d 839, 845 (Miss. 1990)). In other words, "[a] citation for contempt is proper when the contemn[o]r has willfully and deliberately ignored the order of the court. This Court will defer to the chancellor's ability to view the witnesses, determine their credibility, and review the exhibits before the chancery court." *Doyle v. Doyle*, 55 So. 3d 1097, 1110 (¶44) (Miss. Ct. App. 2010) (citation and internal quotation marks omitted).

¶52. A reviewing court will not reverse the chancery court's contempt finding if it is supported by substantial evidence. *Doyle*, 55 So. 3d at 1113 (¶56). "Additionally, where the chancellor has made no specific findings, we will proceed on the assumption that he resolved all such fact issues in favor of the appellee." *Ferrara v. Walters*, 919 So. 2d 876, 881 (¶8) (Miss. 2005) (citing *Newsom v. Newsom*, 557 So. 2d 511, 514 (Miss. 1990)).

¶53. In this case, although the chancery court made specific findings that Jim had not abided by the court's orders, it also found that Katherine was in contempt as well. There is substantial evidence in the extensive record before us that supports the chancery court's finding that Katherine, too, had violated the judgment of divorce. The children testified that Katherine had disparaged Jim in their presence, violating Article I, Section 1.3 of the

PSCCSA. One even saw her make an obscene gesture to him. Katherine failed to inform Jim of several school activities, including KMB's spelling bee and KMB's large number of absences, violating Article I, Section 1.9 of the PSCCSA. Katherine had prevented Jim from having custody of all the children for the two hours he was allowed on his birthday, violating Article I, Section 1.2(d) of the PSCCSA. Katherine had attempted to take items from the home (an iron gate and her bicycle) before the parties had divided the personal property, violating Article III, Section 3.5(f) of the PSCCSA. Concerning that division, Katherine refused to participate in the agreed-upon division of the marital property as announced to the chancery court, again violating Article III, Section 3.5(f) of the PSCCSA, which required the parties to make a good faith effort at dividing the property.

¶54. Although a party who successfully prosecutes a contempt action may be entitled to attorney's fees, *Mabus*, 910 So. 2d at 489 (¶8), "[w]hen the court denies a spouse's petition for contempt, no award of attorney's fees is warranted." *Weston v. Mounts*, 789 So. 2d 822, 827 (¶21) (Miss. Ct. App. 2001) (quoting *Varner v. Varner*, 666 So. 2d 493, 498 (Miss. 1995). "The fact that a successful petitioner is eligible for an award of attorney's fees [in a contempt action] does not automatically entitle him [or her] to an award." *Suess v. Suess*, 718 So. 2d 1126, 1129-30 (¶13) (Miss. Ct. App. 1998). In *Day v. Day*, 28 So. 3d 672, 677 (¶23) (Miss. Ct. App. 2010), the chancery court declined to award attorney's fees even though the wife had proven her husband to be in contempt on some issues. We found no error and noted that the chancellor was not uncritical of the wife on other issues. *Id*. at (¶25). We said, "[i]t is the function of the chancellor to weigh all of the facts and assess the

28

circumstances and to award attorney's fees accordingly." *Id*. at (¶24). *See also Hartley v. Hartley*, 317 So. 2d 394, 395 (Miss. 1975) ("It is especially true in divorce cases that circumstances alter cases and that the chancellor should have wide authority and discretion in setting appropriate attorney's fees after carefully considering the facts of each case."). Because the chancery court found that Katherine was also in contempt of court, we find no abuse of discretion by the chancery court in denying Katherine's request for attorney's fees.

**Conclusion**

¶55. Due to Katherine's breach of the settlement agreement she reached in her first motion for contempt concerning the manner and method of the division of personal property, and because of her failure to submit to the chancery court proof of the items she claimed were inherited or gifted, the chancery court did not err in declining to undertake division of the parties' remaining items of personal property. Moreover, there was sufficient evidence in the record of Katherine's own failure to comply with orders of the chancery court to support a finding that she was in contempt and not entitled to attorney's fees. Accordingly, we affirm the judgments of the chancery court in this matter.

¶56. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. BARNES, C.J., NOT PARTICIPATING.**